UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

ANA PAGAN,

Plaintiff,

-against-

COMMISSIONER OF SOCIAL SECURITY,

Defendant.

**24-CV-9162 (KHP)**

**OPINION AND ORDER**

---

**KATHARINE H. PARKER, United States Magistrate Judge:**

Plaintiff Ana Pagan brings this action challenging the decision of the Commissioner of

Social Security (the "Commissioner") that she is not entitled to Supplemental Social Security

Income ("SSI") benefits for the period July 19, 2021 through July 24, 2024.[1]  At issue is whether

the Commissioner's decision denying disability benefits should be affirmed or whether this

matter should be remanded to the Commissioner for further proceedings. Before the Court is

Plaintiff's motion for judgment on the pleadings.  For the reasons that follow, Plaintiff's motion

for judgment on the pleadings is **DENIED** and judgment is granted in favor of Defendant.

## BACKGROUND

Plaintiff was born on April 19, 1972, and was 49 years old when she filed her claim for

benefits due to mental health-caused disability.[2] (Certified Administrative Record ("CAR"), ECF

No. 11, at 36, 326.)  She has a limited education, only having finished the ninth grade. (CAR, at

---

[1] Plaintiff filed an application for SSI in 2013 alleging she was entitled to benefits because she could not work due to depression.  That application for benefits was denied.  She again applied for SSI in July 2015 on the ground she could not work due to depression, anxiety, diabetes and obesity.  That application also was denied.  The ALJs indicated that treatment notes did not reflect an inability to work.

[2] Plaintiff has several conditions that were deemed non-severe and are not at issue here including diabetes, hypertension, obesity and asthma.  She does not contest the finding that these were non-severe.

1

41.)  She was last employed as a child monitor in 2010.  (*Id.* at 52-53.)  She stopped working after her mother died when she experienced severe depression.[3]  During the relevant period, Plaintiff took over the complete care of two grandchildren (both of whom have special needs).  (*See, e.g., id.* at 466, 490-91, 512, 561, 574, 594, 647, 652, 672, 675, 696, 700.)

   1.   Plaintiff's Medical History and Treating Providers

At the time she applied for disability benefits in 2021, Plaintiff had been receiving regular mental health treatment for depression, anxiety, bipolar disorder, and post-traumatic stress disorder ("PTSD") for at least six years and took medication to control her symptoms.[4] The administrative record contains medical records for the period 2018 through April 2024, just prior to the hearing before the Administrative Law Judge ("ALJ").  Plaintiff's treating mental health providers are primarily associated with Damian Family Care Centers, Inc., and Third Avenue Family Health Center in the Bronx.  She consistently saw her medical and mental health providers during this period.  Her mental health providers included her psychiatrist Dr. Edward Fruitman, M.D., Benefita Jones, P.A., Albert Jimenez Cabrera, L.M.S.W., and Sydney Leviton, L.M.S.W.  Other providers she saw included Ghazanfar Abdullah and Dr. Ali Islam.

In general, the medical records and all the treatment notes for the relevant period show that Plaintiff's mental health regimen, which included psychotherapy and medication, was effective in controlling symptoms and allowed her to raise two of her grandchildren, advocate for their needs, babysit for a neighbor's child, and help a friend who had relapsed into

---

[3] During her lifetime, the record reflects Plaintiff worked as a cashier at fast food restaurants and retail stores, was a childcare provider and work for the Parks Department doing maintenance. (CAR, at 391.)

[4] Her medication has included Ambien, Lexapro, Ativan, Wellbutrin, and Latuda at various times. (*See, e.g.*, CAR, at 421, 468, 641.)

substance abuse. (*Id.* at 608, 675.)  While the progress notes reflect that Plaintiff's mood varied over the period depending on various stressors in her life and included at various times feeling sad, anxious, overwhelmed, and frustrated, particularly when dealing with significant issues with her family, in virtually all of the treatment notes for the entire relevant period, she denied having hallucinations or an inability to cope, and her providers throughout generally assessed Plaintiff as having a good general appearance with good hygiene; being alert and oriented; having coherent thought processes; and fair impulse control, judgment and insight. (*See, e.g.*, *id.* at 461, 476, 485, 492, 495, 503, 508, 513, 520, 523, 536, 543, 549, 552, 555, 559, 565, 571, 574, 577, 580, 588, 591, 595, 598, 606, 616, 619, 641, 661, 669, 675, 679, 684, 687, 691, 696, 700, 940.)  She often denied having depression, anger, mood swings, crying spells, anxiety, sleep or appetite problems and hallucinations. (*Id.* at 518, 535, 542, 547, 587, 602, 611, 684, 691, 696, 939.)  There is no evidence in the record of any time during the relevant period when Plaintiff decompensated or was hospitalized for mental health issues.[5] (*See* CAR, at 460, 468, 473, 478, 482, 490, 494, 500, 507, 518, 522, 531, 535, 547, 551, 554, 558, 564, 570, 574, 577, 580, 583, 587, 590, 594, 597, 602, 611, 615, 628, 640, 643, 647, 651, 656, 660, 665, 668, 672, 675, 678, 684, 687, 691, 696, 700, 939 (noting Plaintiff consistently denied hospitalizations since last visit).)  Her mental health-related medicines were adjusted over time, and the records reflect that adjustments to medications, especially starting in late 2021, were more effective and that Plaintiff generally improved thereafter. (*See id.* at 698 (prescribing Ativan around August 2021); *see also id.* at 641, 652, 657, 666, 673, 675, 685, 691, 940 (noting for visits after

---

[5] The record reflects one suicide attempt in 2010.  For the period 2018 through April 2024, there is no record of hospitalizations or emergency room visits for mental health issues.

Ativan was prescribed that it "has been helpful" and noting her mood/affect generally and consistently as appropriate, neutral, and euthymic.)

As of January 2019, she reported her medication helped to alleviate her depressive symptoms and she was able to cook for herself and family, pay bills, and clean the house. (*Id.* at 511-12.)  In February 2019, she reported she never asks for help with completing important documents and is confident filling out important forms herself, she is bilingual, can easily cook for herself and her family, pays her bills on time, and likes to clean and listen to Christian music. (*Id.* at 490-92.)  In May 2019, she reported being tired from a busy weekend taking her grandchildren to the statue of liberty and other city landmarks. (*Id.* at 458.)  Her provider commented that she displayed "great self-advocacy skills against her grandchildren's parents who have neglected the children," including by saving evidence to take them to court. (*Id.* at 458-60.)

By June 2019, Plaintiff reported her mood had improved, although she was still irritable from taking care of her grandchildren.  She said she was no longer crying as much as she used to. (*Id.* at 563-65.)  In July 2019, she reported she was doing better on a new medication and was no longer crying. (*Id.* at 558.)  She continued reporting doing well with her medication, although still reported feeling stressed and irritable. (*Id.* at 547.)  Her medication was changed and by November 2019, she reported that she was "doing much better" with the change in medication and denied ongoing depressive symptoms.  Her provider noted she remained mentally stable. (*Id.* at 535, 542.)  Also, at the end of 2019 and into early 2020, she noted to her provider that she was "temporarily" unable to work and was applying for public assistance. (*Id.* at 516, 528.)

4

In early 2020, Plaintiff reported her new medication was helping, her mood was improved, she felt less irritable and denied ongoing depressive symptoms.  Treatment notes reflect she was alert and oriented to person, place, and time; well-groomed; and had a cooperative attitude and coherent thought process, with fair impulse control, judgment, and insight. (*Id.* at 518-20).  She continued to deny any significant symptoms and to report doing well on her then-current regimen throughout 2020.  For example, on August 12, 2020, Plaintiff visited P.A. Jones and Dr. Fruitman for continued follow-up and a medication refill. (*Id.* at 794-96.)  Plaintiff reported anxiety, restlessness, and excessive worry. (*Id.* at 794.)  A mental status examination revealed an anxious and worried mood/affect, fair impulse control, and fair insight and judgment. (*Id.* at 795.)  The Assessment from that visit indicated generalized anxiety disorder and bipolar disorder. (*Id.* at 795-96.)  The report of the visit included a plan for Plaintiff to take Ambien, Wellbutrin, and Latuda, as well as psychotherapy. (*Id.*)  Notes from a follow-up visit to Dr. Fruitman in November 2020 noted no significant changes to Plaintiff's mental health. (*Id.* at 611-13.)

The treatment notes reflect Plaintiff continued to be stable throughout 2021 and that her medication and therapy were helping her with learning and applying coping mechanisms.  However, her mood varied over time.  At a visit with Dr. Fruitman on February 10, 2021, Dr. Fruitman noted she exhibited an anxious and worried mood/affect, with fair impulse control, judgment, and insight. (*Id.* at 602-03.)  Her medications were not changed. (*Id.* at 604.)  On April 1, 2021, Plaintiff had a telephone psychotherapy session with L.M.S.W. Leviton. (*Id.* at 594.)  Leviton described Plaintiff's mood/affect as "restricted," with fair insight, judgment, and impulse control. (*Id.* at 594-95.)  At a May 4, 2021 follow-up with Dr. Fruitman, Plaintiff

reported she had low self-esteem, and Dr. Fruitman noted Plaintiff continued to be anxious and restless, with excessive worry. (*Id.* at 587.)  His report noted Plaintiff had a sad, anxious, and worried mood/affect but fair impulse control, insight, and judgment. (*Id.* at 588-89.) Plaintiff visited L.M.S.W. Leviton on May 25, 2021. (*Id.* at 580.)  She reported doing "okay" but was also experiencing a "significant" exacerbation of anxiety and depression. (*Id.*)  Plaintiff reported hesitating to engage in therapy. (*Id.*)  The visit report noted her mood/affect to be "restricted" with fair impulse control, judgment, and insight. (*Id.* at 580-81.)  At a June 28, 2021 therapy visit with Leviton, Plaintiff reported feeling overwhelmed. (*Id.* at 574.)  Leviton indicated Plaintiff had an anxious and worried mood/affect and fair impulse control, insight, and judgment. (*Id.* at 574-75.)

At a July 29, 2021 visit with Leviton, Leviton noted Plaintiff had a fair mood with congruent affect but reported feeling overwhelmed, fatigued and anxious.  At the same meeting, she mentioned to her provider that she had begun watching a friend's newborn baby "as a source of income," which was a significant amount of work on top of caring for her grandson. (*Id.* at 700-01.)  There were no significant changes noted in her impulse control, insight, and judgment. (*Id.* at 700-02.)

On August 3, 2021, Plaintiff attended a psychiatric follow-up with P.A. Jones and Dr. Fruitman.  The report of the visit indicated Plaintiff had an anxious and worried mood/affect with fair impulse control, judgment, and insight. (*Id.* at 697-98.)  Ativan was added to Plaintiff's prescriptions. (*Id.*)

On September 27, 2021, Plaintiff attended a therapy appointment with Leviton and reported that she was "hanging in there," with some improvement in her symptoms since the

6

prescription of additional medication. (*Id*. at 687.)  She reported that she continued "working full time caring for a baby" but that her grandson was back in school in person and the structure of work was helpful in managing her symptoms while her grandson was at school. (*Id*.)  Leviton noted Plaintiff's mood/affect as "neutral, congruent." (*Id.*)

On October 12, 2021, Plaintiff saw P.A. Jones and reported improvement with treatment and that her grandson was going to school in person, allowing her to relax at home.  She reported she continued to babysit a neighbor's baby, which kept her busy at home.  She denied depressive symptoms. (*Id.* at 684.)  Jones noted Plaintiff's mood/affect as "appropriate, neutral, euthymic." (*Id.* at 684-85.)  Plaintiff continued with her therapy and reports from those visits indicate Plaintiff's status remained stable and unchanged. (*Id.* at 656-59, 665-67, 672-76.)  In November 2021, she reported frustration about being denied SSI in the past and that she thought the system is "rigged in the wrong direction."  She said she had anxiety about not having a stable income but reported that her babysitting job was helping. (*Id.* at 674.)  At the end of 2021, she reported feeling mentally well. (*Id.* at 665-66.)

Records from Plaintiff's providers report that Plaintiff continued to do well on her medications and continued to regularly see her providers throughout 2022, who generally reported that Plaintiff was doing well and reported she was "mentally well on [her] current regimen" and denied having debilitating symptoms. (*Id.* at 641, 662, 657.)  One exception is when she met with a consultative examiner in February 2022, John Laurence Miller, Ph.D,  in connection with her application for SSI. (*Id.* at 628-32.)  She reported to Dr. Miller she had difficulty falling asleep and loss of appetite, excessive worry and apprehension, one or two panic attacks per month, visual hallucinations, feeling hopeless, irritable, and thinking about

suicide. (*Id.* at 628-29.)  Dr. Miller, however, found that Plaintiff had coherent, goal-directed thought processes; orientation intact to person, place, and time; an anxious mood; and average cognitive functioning. (*Id.* at 629-30.)  Notably, only a week after meeting with Dr. Miller, Plaintiff reported to her treating provider that she was feeling well on her regimen. (*Id.* at 656-57.)  On April 5, 2022, Plaintiff saw P.A. Jones.  The notes from the visit indicate Plaintiff's mood/affect was appropriate, neutral, and euthymic, with fair impulse control, judgment, and insight.  Although Plaintiff reported struggling with caring for her two grandchildren with special needs, she said she was feeling "mentally well," and her sleep and appetite were normal. (*Id.* at 651-53.)

Reports of her multiple subsequent visits between May 2022 and April 2023 reflected largely unchanged mental status. (*Id.* at 640-42, 705-07, 711-13, 718-26, 730-36, 740-48, 756-58.)  For example, as of October 2022, she reported being able to get help for her grandchild with special needs and getting him restarted on medications.  She said she had a lot going on and keeps herself busy. (*Id.* at 743.)  In April 2023, she reported she was continuing to babysit and taking care of a one-year-old child. (*Id.* at 724.)

The same pattern continued through April 2024.  Plaintiff continued to regularly see her providers and report frustrations and stress from caring for her grandchildren but otherwise feeling "mentally well." (*Id.* at 705-730, 939-53, 958-63.)  On November 1, 2023, Plaintiff reported she was not sleeping well at night but was otherwise stable. (*Id.* at 968.)  In December 2023, she reported she was stable, although having some relationship issues with her romantic partner. (*Id.* at 939.)  Her provider noted Plaintiff was cooperative; had a coherent thought

process. (*Id.*)  Her impulse control, judgment, and insight were noted fair, with appropriate, neutral, and euthymic mood/affect. (*Id.* at 940-41.)

Plaintiff's treating psychiatrist, Dr. Fruitman, completed a mental impairment questionnaire ("MIQ") on November 23, 2023, that reported Plaintiff had "moderate" limitations in activities of daily living ("ADLs"), difficulties maintaining social functioning, and difficulties in maintaining concentration, persistence or pace. (*Id*. at 933-36.)  He indicated her medications only partially controlled her symptoms. (*Id.*)  He described her as presenting "anxious, restless," and that she "endorse[d] difficulty sleeping, poor motivation, limited ability to perform ADLs," with a prognosis of chronic mental illness. (*Id.*)  He indicated anhedonia, appetite disturbance with weight change, decreased energy, generalized persistent anxiety, mood disturbance, difficulty thinking or concentrating, sleep disturbance, and emotional withdrawal or isolation. (*Id.*)  He also indicated that she had one or two episodes of decompensation within the last twelve-month period, each of at least two weeks in duration. He anticipated Plaintiff's limitations would cause her to be absent from work more than four days per month. (*Id.*)  At Addendum B, he reported that Plaintiff presented with evidence of depressed mood, diminished interest in almost all activities, appetite disturbance with change in weight, sleep disturbance, decreased energy, and difficulty concentrating or thinking. (*Id.* at 938.)  At the same time, he noted she could manage her benefits on her own. (*Id.* at 936.)  Dr. Fruitman also completed a check box indicating mental health issues of the most serious kind— "extreme"—that included marked limitations in concentrating, persisting, maintaining pace, adapting and managing oneself and only marginal ability to adjust to changes. (*Id.* at 938.)

2.   Consultative Examiners and State Agency Consultants

In connection with its review and consideration of Plaintiff's application for disability benefits, the Commissioner considered the opinions of several consultative examiners and/or state agency reviewers.

On February 25, 2022, John Laurence Miller, Ph.D, examined Plaintiff at the behest of the Commissioner. (*Id.* at 628-32.)  Dr. Miller noted Plaintiff's medical and psychiatric history as well as medications she was taking, including Wellbutrin, Latuda, clonidine, and Ambien prescriptions. (*Id.*)  As noted above, Dr. Miller noted Plaintiff reported her symptoms included trouble sleeping, loss of appetite, feelings of hopelessness, irritability, feelings of worthlessness, diminished sense of pleasure, social withdrawal, recurring thoughts of suicide, excessive worry and apprehension, avoidance of social situations, hypervigilance, nightmares, intrusive thoughts, panic attacks, visual hallucinations, concentration difficulties, and short-term memory deficits. (*Id.* at 628-29.)  His mental status exam revealed a dysphoric affect and anxious mood, with impaired attention and concentration, impaired memory, and fair insight. Plaintiff declined to attempt the serial 7s task. (*Id.* at 630.)  Dr. Miller diagnosed post-traumatic stress disorder ("PTSD") and major depressive disorder with psychotic features. (*Id.* at 631.)  He opined that Plaintiff was "moderately limited" in her ability to understand, remember or apply complex directions/instructions; interact adequately with supervisors, coworkers, and the public; sustain concentration and perform a task at a consistent pace; sustain an ordinary routine and regular attendance at work; and regulate emotions, control behavior, and maintain well-being. (*Id.*)

10

On March 22, 2022, state agency psychological consultant Dr. J. May reviewed the record and opined that Plaintiff had a moderate limitation in understanding, remembering, or applying information and concentrating, persisting, or maintaining pace. (*Id.* at 97-98.)  These limitations included the ability to maintain attention and concentration for extended periods. (*Id.* at 102.)  Dr. May also opined Plaintiff had a mild limitation for interacting with others and adapting or managing herself and concluded she had the capacity for simple tasks. (*Id.* at 98-99.)

On June 10, 2022, state agency psychological consultant Dr. E. Kamin reviewed the record and opined that Plaintiff had a moderate limitation in understanding, remembering, or applying information and concentrating, persisting, or maintaining pace. (*Id.* at 115-116.)  These limitations included a moderate limitation regarding Plaintiff's ability to "maintain attention and concentration for extended periods." (*Id.* at 119.)  Dr. Kamin also found Plaintiff had a mild limitation for interacting with others and adapting or managing herself, and that Plaintiff could perform simple tasks. (*Id.* at 115-16.)

On February 25, 2022; March 23, 2022; and June 13, 2022; multiple doctors found no evidence of any severe physical limitations. (*Id.* at 97, 114, 624.)

3.  The Administrative Proceeding and ALJ Decision

At the hearing held on May 15, 2024, conducted by Administrative Law Judge ("ALJ") Edward Malvey, Plaintiff testified she suffered from depression, anxiety, bipolar disorder, and PTSD.[6] (*Id.* at 43.)  She indicated she would "fight with [her] own demons in [her] head" and

---

[6] The record reflects that a hearing was scheduled for October 25, 2023, but that Plaintiff failed to appear.  (CAR, at 289-94.)  Accordingly, it was rescheduled.

11

struggle to focus. (*Id.* at 43-45.)  She described herself as a "zombie" and said she suffered

crying spells around three times a week and isolates herself from others. (*Id.*)  She said she had

trouble sleeping. (*Id.* at 47.)  She said she only leaves her apartment about once a month to see

her psychiatrist and doesn't shower when she is depressed and falls into a deep depression

about twice a week. (*Id.* at 46-47.)  She also testified to having panic attacks twice per month.

(*Id.* at 50.)  She denied babysitting in 2021, stating "I don't consider it babysitting.  It was just

something that, you know – my grandson's tutor, she had a baby.  So, while she tutors my

grandson, she used to bring her daughter."  She said that because the mother was present, she

didn't see it as babysitting. (*Id.* at 51.)

Vocational Expert ("VE") Diamond Warren also testified at the hearing.  She stated that

an individual of Plaintiff's age, education, and work history, who was limited to perform simple

and routine work for two-hour intervals and only occasional interaction with the public,

supervisors and co-workers, could not perform Plaintiff's past work with childcare/being a child

monitor. (*Id.* at 53.)  Nonetheless, the VE stated that such a person could perform jobs such as

Cleaner II, Hospital Cleaner, and Order Picker. (*Id.*)  On the other hand, she stated if such

individual could have no interaction with the public, the individual could not perform any of

those jobs. (*Id.* at 54.)  Likewise, the VE testified that one absence per month would be an

acceptable threshold to maintain regular employment, so long as there were no more than

twelve absences throughout the year. (*Id.*)  Further, the VE opined that if such a person needed

fifteen minutes between one-hour intervals of simple routine tasks in addition to normal

breaks, such person could not perform these jobs. (*Id.* at 55.)  Finally, the VE testified to

maintain regular employment, such an individual could not spend more than ten percent of the workday off-task. (*Id.*)

ALJ Malvey issued his decision denying Plaintiff disability benefits on July 24, 2024. He concluded that Plaintiff (1) had not engaged in substantial gainful activity since July 19, 2021, the application date; (2) she had severe impairments of depressive disorder, bipolar disorder, anxiety disorder, and PTSD; (3) she did not have an impairment or combination of impairments that met or medically equaled the severity of one of the impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1; (4) she had residual functional capacity ("RFC") to perform a full range of work at all exertional levels but with limitations to simple and routine work for two-hour intervals and only occasional interaction with the public, supervisors and co-workers; (5) Plaintiff could not perform past relevant work; (6) Plaintiff was 49 years-old at the time the application was filed; (7) she had a limited education; (8) transferability of job skills was not material to the determination; (9) there are jobs in significant numbers in the national economy that the claimant could perform after considering her age, education, work experience, and RFC; and (10) Plaintiff had not been under a disability since July 19, 2021, when the application was filed. (*Id.* at 19-26.)

In connection with the RFC determination, ALJ Malvey considered Plaintiff's impairments, her medical and employment history, her testimony, and relevant evaluations of her condition. (*Id.* at 22-23.) He determined "her treatment sources show unremarkable psychiatric exams and reports of improvement by the claimant starting in the end of 2021." (*Id.* at 23.) He noted Plaintiff "consistently denied having symptoms of depression, a sad mood, mood lability, irritability, crying spells or anxiety." (*Id.*) He concluded that Plaintiff's functional

13

limitations "do not prevent her from meeting the basic demands of regular work on a sustained basis." (*Id.* at 23.)  He noted that the finding that she had no severe physical limitations was well supported and that her diabetes and hypertension did not result in severe limitations. (*Id.* at 24.)

He also discussed the evidence regarding limitations in Plaintiff's memory and understanding as well as sustained concentration and persistence, noting the examiners found no more than moderate mental limitations, which he concluded were supported by the record. (*Id.*)  He deemed the state agency mental consultants persuasive. (*Id.*)

On the other hand, he determined that Dr. Miller was only somewhat persuasive. (*Id.* at 24-25.)  Key to this finding was that it was "somewhat inconsistent with subsequent treatment notes at Damian Family which show no problem with others, no issues with memory or concentration." (*Id.*)  ALJ Malvey also noted Plaintiff's claims of auditory and visual hallucinations were inconsistent with her medical records. (*Id.* at 25.)

ALJ Malvey concluded Dr. Fruitman's MIQ was "not persuasive." (*Id.*)  The ALJ said Dr. Fruitman opined Plaintiff had "extreme or marked limitations in concentration, persistence, and pace and in adapting" and "would be absent more than four times per month." (*Id.*)  However, the ALJ said the finding regarding her attendance was "not supported by explanation," and "internally inconsistent with Dr. Fruitman's own reports of moderate limitations in concentration, persistence, and pace and only 1-2 episodes of decompensation" in the prior 12 months. (*Id.* at 25, 935.)  ALJ Malvey noted "[t]he fact that Dr. Fruitman is a treating source etc. is offset by the fact that his opinion is just inconsistent with his own treatment notes and other findings in the medical evidence of record." (*Id.* at 25.)

**LEGAL STANDARD**

**1.  Scope of Judicial Review under 42 U.S.C. § 405(g)**

A court reviewing a final decision by the Commissioner must, as a threshold matter, determine whether the ALJ provided the plaintiff with a full and fair hearing under the Secretary's regulations and fully and completely developed the administrative record. *See Intonato v. Colvin*, No. 13 Civ. 3426 (JLC), 2014 WL 3893288, at *8 (S.D.N.Y. Aug. 7, 2014) (internal citation omitted).  The duty to develop the record requires the ALJ "to ensure that the record contains sufficient evidence to make a determination." *Bussi v. Barnhart*, No. 01 Civ. 4330 (GEL), 2003 WL 21283448, at *8 (S.D.N.Y. June 3, 2003).  The ALJ must obtain additional information "when the evidence as a whole is not complete enough for the ALJ to make a determination." *Id.* (citation omitted).  An ALJ's failure to adequately develop the record is an independent ground for vacating the ALJ's decision and remanding the case. *Moran v. Astrue*, 569 F.3d 108, 114-15 (2d Cir. 2009).

Once the Court is satisfied that the plaintiff was afforded a full hearing and the record is fully developed, the Court then assesses the Commissioner's conclusions.  In doing so, the Court is limited to determining whether the Commissioner's conclusions (1) "were supported by substantial evidence in the record," and (2) "were based on [application of the] correct legal standard." *Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013) (citing *Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012)).  "A court must set aside legally erroneous agency action unless 'application of the correct legal principles to the record could lead only to the same conclusion,' rendering the errors harmless." *Amparo v. Comm'r of Soc. Sec.*, No. 20 Civ. 10285 (JMF) (SDA),

2022 WL 3084482, at *7 (S.D.N.Y. July 19, 2022) (quoting *Garcia v. Berryhill*, No. 17 Civ. 10064 (BCM), 2018 WL 5961423, at *11 (S.D.N.Y. Nov. 14, 2018)).

Substantial evidence is "more than a mere scintilla." *Biestek v. Berryhill*, 587 U.S. 97, 103 (2019).  "It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (cleaned up) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).  To be supported by substantial evidence, the ALJ's decision must be based on consideration of "all evidence available in [the claimant]'s case record." 42 U.S.C. § 423(d)(5)(B).  The ALJ's decision must set forth "a discussion of the evidence" and the "reasons upon which [the decision] is based." *Id*. § 405(b)(1).  It must do so "with sufficient specificity to enable the reviewing court to decide whether the determination is supported by substantial evidence." *Herrera v. Comm'r of Soc. Sec.*, No. 20 Civ. 7910 (KHP), 2021 WL 4909955, at *5 (S.D.N.Y. Oct. 21, 2021) (citing *Calzada v. Astrue*, 753 F. Supp. 2d 250, 269 (S.D.N.Y. 2010)).

That said, the ALJ need not "mention[] every item of testimony presented," *Mongeur v. Heckler*, 722 F.2d 1033, 1040 (2d Cir. 1983), or "reconcile explicitly every conflicting shred of medical testimony," *Zabala v. Astrue*, 595 F.3d 402, 410 (2d Cir. 2010).  If the ALJ fails to consider evidence in the record, the Court must be "able to look to other portions of the ALJ's decision and to clearly credible evidence in finding that his determination was supported by substantial evidence." *Mongeur*, 722 F.2d at 1040 (cleaned up).  If the Commissioner's findings are supported by substantial evidence, those findings are conclusive. 42 U.S.C. § 405(g); *see also Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010); *Perez v. Chater*, 77 F.3d 41, 46 (2d Cir. 1996).

16

### 2. Standard Governing Evaluations of Disability Claims by the Commissioner

Under the Act, a claimant is disabled if she lacks the ability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).  A person will be found to be disabled within the meaning of the Act only if it is determined that the "impairment or impairments are of such severity that [s]he is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A).

To determine eligibility for disability benefits, the Commissioner is required to conduct a sequential five-step inquiry whereby the Commissioner determines: (1) whether the claimant is currently engaged in any substantial gainful activity ("SGA"); (2) if not, whether the claimant has a "severe" impairment or combination of impairments that limits their ability to do basic work activities; [7] (3) if so, whether the impairment is listed in Appendix 1 of the regulations, and what the claimant's RFC is; [8] (4) if the impairment does not qualify as a listed impairment, whether the claimant possesses the RFC to perform their past relevant work; and (5) if the claimant is

---

[7] An impairment, or a combination of impairments, is considered "severe" under the regulations when it substantially restricts an individual's capacity to carry out basic work-related activities.  Conversely, an impairment or combination of impairments is deemed "not severe" when the medical and other relevant evidence demonstrates that it involves no more than a minor abnormality – or a set of minor abnormalities – that would have only a minimal impact on the individual's ability to perform work functions. *See* 20 C.F.R. § 404.1522, Social Security Rulings (SSRs) 85-28 and 16-3p.  The Agency's Listing of Impairments "describes for each of the major body systems[,] impairments ... consider[ed] ... severe enough to prevent an individual from doing any gainful activity." 20 C.F.R. § 404.1525(a).

[8] A plaintiff's RFC is her ability to do physical and mental work activities on a sustained basis despite limitations from physical or mental impairments.  In making this finding, the Commissioner must consider all of the plaintiff's impairments, including impairments that are not severe. *See* 20 C.F.R. §§ 404.1520(e), 404.1545.

not capable of performing past work, whether she is capable of performing other work that exists in the national economy when considering age, education, and work experience. *See Vellone v. Saul*, No. 20 Civ. 261 (RA) (KHP), 2021 WL 319354, at *5 (S.D.N.Y. Jan. 29, 2021), *report and recommendation adopted sub nom. Vellone ex rel. Vellone v. Saul*, No. 20 Civ. 261 (RA) (KHP), 2021 WL 2801138 (S.D.N.Y. July 6, 2021).  The claimant bears the burden of proof at the first four steps of the analysis, and at the last step, the Commissioner has the burden of showing there is other work the claimant could perform. *Nunez v. Comm'r of Soc. Sec.*, 164 F.4th 60, 68 (2d Cir. 2025) (citing *Estrella v. Berryhill*, 925 F.3d 90, 94 (2d Cir. 2019)).  However, "a claimant need not be an invalid to be found disabled under the Social Security Act." *Nunez v. Comm'r of Soc. Sec.*, 164 F. 4th 60, 77 (2d Cir. 2025) (cleaned up).  To qualify for benefits under the Act, a plaintiff must present evidence demonstrating an inability "to engage in any [SGA] by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a *continuous* period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A) (emphasis added).

When considering evidence in the form of medical opinions, the Commissioner must consider: (1) supportability, (2) consistency, (3) relationship with the claimant, (4) specialization, and (5) other factors. 20 C.F.R. §§ 404.1520c(c), 416.920c(c).  The supportability and consistency factors are the "most important," and ALJs must explain how they considered those factors for medical opinions. *Id*. §§ 404.1520c(b)(2), 416.920c(b)(2).  The supportability inquiry focuses "on how well a medical source supported and explained their opinion." *Vellone,* 2021 WL 319354, at *6.  The question of consistency concerns whether the opinion is consistent with other evidence in the medical record. *Id.*  The Commissioner is tasked with analyzing medical opinions at the

source-level, meaning the Commissioner need not discuss each medical opinion in the record, and may apply the five factors holistically to a single medical source. *Id.;* 20 C.F.R. §§ 404.1520c(b)(1); 416.920c(b)(1).  Regarding claims filed on or after March 27, 2017, in evaluating the medical evidence, the Commissioner need not assign particular evidentiary weight to examining or treating physicians as was previously required by the Act. *Vellone*, 2021 WL 319354, at *6.  However, the regulations continue to recognize the "foundational nature" of the observations of treating sources. *Steven M.W. v. Comm'r of Soc. Sec.*, No. 21 Civ. 390 (LJL) (GRJ), 2022 WL 2669491, at *6 (S.D.N.Y. June 17, 2022), *report and recommendation adopted sub nom*. *Washburn v. Comm'r of Soc. Sec.*, 2022 WL 2669296 (S.D.N.Y. July 11, 2022).  Thus, although the treating physician rule has been abrogated, "the essence of the rule remains the same, and the factors to be considered in weighing the various medical opinions in a given claimant's medical history are substantially similar." *Acosta Cuevas v. Comm'r of Soc. Sec.*, 2021 WL 363682, at *9 (S.D.N.Y. Jan. 29, 2021), *report and recommendation adopted sub nom*, *Cuevas v. Comm'r of Soc. Sec.*, 2022 WL 717612 (S.D.N.Y. Mar. 10, 2022).

## DISCUSSION

At the outset, the Court finds, and the parties do not dispute, that ALJ Malvey provided Plaintiff with a full and fair hearing under the Secretary's regulations and properly developed the administrative record.  Thus, the Court now turns to the contention at the heart of Plaintiff's motion:  that ALJ Malvey's RFC assessment is not supported by substantial evidence because he erred in his assessment of (1) the medical opinion evidence and (2) Plaintiff's testimony about her limitations.  With regard to his assessment of medical evidence, she focuses on the ALJ's asserted failure to explain his rejection of Dr. Fruitman's opinion and partial rejection of Dr.

Miller's opinion, reliance on non-examining doctors' opinion, and substitution of his lay opinion for medical opinion.  I address Plaintiff's arguments below.

1.  **Whether the ALJ Properly Explained His Rejection of Dr. Fruitman's Decision and Partial Rejection of Dr. Miller's Opinion in Determining the RFC**

### A.  *Dr. Fruitman*

Plaintiff argues that ALJ Malvey did not accord due weight to the Dr. Fruitman's opinions when making a determination regarding Plaintiff's RFC insofar as he did not adequately explain his rejection of the opinion, especially when, in Plaintiff's view, Dr. Fruitman's opinions about Plaintiff's limitations are supported by her treatment record and consistent with the record as a whole, pointing to evidence in the record where Plaintiff reported she was feeling anxious and worried, had a restricted mood, and fair impulse control, insight and judgment.  Plaintiff also argues that the ALJ's reliance on statements in the record that Plaintiff was "stable" is improper because being "stable" does not necessarily mean a person is able to enter the workforce where the person will be subjected to many more stresses and demands, especially considering Plaintiff "spend[s] nearly all of her days isolated at home with significant assistance even with basic daily activities from her family." She asserts that the ALJ failed to consider that Dr. Fruitman was a treating source and the longitudinal record, which is especially important when assessing limitations from mental illness.

ALJ Malvey found Dr. Fruitman's MIQ unpersuasive in two key ways.  First, he concluded Dr. Fruitman's finding that Plaintiff would be absent from work four times a month was "not supported by explanation." (CAR, at 25.)  He further found it inconsistent "with Dr. Fruitman's own report of moderate limitations in concentration, persistence, and pace and only 1-2 episodes of decompensation." (*Id.*)  Second, he noted that Dr. Fruitman at different points

20

apparently selected different degrees of limitation in concentration, persistence, and pace and adapting. (*Id.*; *compare id.* at 935, *with id.* at 938)  ALJ Malvey determined "[t]he fact that Dr. Fruitman is a treating source etc. is offset by the fact that his opinion is just inconsistent with his own treatment notes and other findings in the medical evidence of record." (*Id.*)

The Court detects no error in ALJ Malvey's evaluation of Dr. Fruitman.  Indeed, Dr. Fruitman's evaluation *was* internally inconsistent, finding extreme limitations in concentration and adaptation at Addendum B to the MIQ but noting only moderate limitations to concentration, persistence or pace; ADLs; and social functioning in the MIQ itself. (*Id.* at 935, 938.)  Further, based on the treatment record, the ALJ appropriately concluded that Dr. Fruitman's opinion that Plaintiff would be absent four days per month was not supported.  The Court has exhaustively reviewed the Administrative Record to find treatment or progress notes indicating such a limitation or evidence of decompensation and found none; Plaintiff also points to none.

It is true Dr. Fruitman explained in the MIQ  that Plaintiff "present[ed] anxious, restless" and "endorse[d] difficulty sleeping, poor motivation, limited ability to perform ADLs." (*Id.* at 933.)  And he indicated in the MIQ anhedonia, appetite disturbance, decreased energy, generalized persistent anxiety, mood disturbance, difficulty thinking or concentrating, emotional withdrawal or isolation, and sleep disturbance. (*Id.* at 934.)  But it is also true that Plaintiff's treatment records described above show that from late 2021 through the date of the MIQ Plaintiff generally reported she felt "mentally well"; denied emergent psychiatric care; was cooperative with coherent thought; consistently exhibited fair impulse control, judgment and

21

insight; and was able to care full time for two grandchildren with special needs and to babysit a neighbor's child as a "source of income."

Ultimately, Dr. Fruitman's evaluation was that Plaintiff had moderate limitations in attention and concentration, though he modified that to "extreme" limitations at Addendum B. It is worth noting that while Addendum B provides for a treating physician to indicate that a patient had "Bipolar syndrome with a history of episodic period manifested by the full symptomatic picture of both manic and depressive syndromes" or "Recurrent severe panic attacks manifested by a sudden unpredictable onset of intense apprehension, fear, terror and sense of impending doom occurring on the average of at least once a week," Dr. Fruitman did not indicate these conditions for Plaintiff. (*See id.*)  These indicators might have supported marked limitations in attention and concentration.  Thus, ALJ Malvey's decision to disregard Dr. Fruitman's MIQ with regard to his assessment of Plaintiff's RFC was well supported and consistent with the remainder of the treatment record, which consistently indicated fair impulse control, insight, and judgment, and showed improvements in mood/affect over the course of treatment.

Perhaps most importantly, ALJ Malvey's general point that the medical records showed "unremarkable" psychiatric exams and that Plaintiff showed clear signs of improvement with treatment are well supported by the record. (*See id.* at 23.)  Indeed, while Plaintiff states her mood was marked "anxious and worried" or "restricted," the record makes clear Plaintiff's mood/affect was not marked as anxious at the overwhelming majority of follow-up visits after Ativan was prescribed around August 2021. (*See, e.g., id.* at 641, 652, 657, 666, 673, 685, 687, 706, 712, 719, 731, 757, 969.)  And while "[t]here can be a great distance between a patient

22

who responds to treatment and one who is able to enter the workforce," *Harrison v. Comm'r of Social Security*, No. 20 Civ. 4924 (FB), 2022 WL 3045186, at *2 (E.D.N.Y. Aug. 2, 2022), this observation does not disturb the medical records in this case which paint Plaintiff's attention issues as caused by her emotional distress secondary to depression, which, by late 2021 was being effectively treated through medication and psychotherapy.  Given that the treatment record portrays at least some of Plaintiff's emotional distress symptoms as improving with treatment, it follows that the medical opinion of her attention impairment would be accorded less weight.

Plaintiff notes that the word "stable" "could mean only that her condition has not changed, and she could be stable at a low functional level," *Kohler v. Astrue*, 546 F.3d 260, 268 (2d Cir. 2008), but this argument is not persuasive when the treating providers consistently marked Plaintiff's impulse control, judgment, and insight as "fair" from the beginning of the relevant period through the date of the hearing.  Moreover, the use of the word "stable" in her treatment records and progress notes played no express role in the ALJ's determinations. Plaintiff's wording in her brief suggests that her impulse control, judgment, and insight deteriorated over time, but that is not what her treatment records and progress notes reflect. Further, as the Court has noted, there are no incidents in the treatment record of decompensation at all during the entire relevant period when Plaintiff was certainly dealing with significant stressors in her life related to caring for her grandchildren.

Given the foregoing, it is of no moment that—as Plaintiff argues—"[p]sychiatric signs are medically demonstrable phenomena that indicate specific psychological abnormalities" or that "[p]sychiatric testing is inherently based on subjective reports" insofar as mental health

impairments "tend to be less susceptible to objective testing and assessment." *See* 20 C.F.R. § 416.902(g); *Rucker v. Kijakazi*, 48 F.4th 86, 92 (2d Cir. 2022).  There is nothing in ALJ Malvey's decision to suggest that he disregarded her subjective complaints or psychiatric indicators in the medical opinions; rather, he adequately apprehended them and addressed them for their supportability and consistency with the treatment record and progress notes.  Accordingly, ALJ Malvey did not err in rejecting Dr. Fruitman's findings and sufficiently explained them as not supported by or consistent with the record.

### B.  Dr. Miller

Plaintiff argues the ALJ failed to explain why he found Dr. Miller's opinions only somewhat persuasive, saying that "one is left to guess how the ALJ considered each of Dr. Miller's opinions" under the supportability and consistency factors.  She argues the ALJ's failure to explain was not harmless error given that her treating psychologist found greater limitations than the ALJ, particularly in the area of her ability to sustain an ordinary routine and attendance at work, regulate her emotions, control her behavior, and maintain well-being.  And she points out it is particularly unclear whether the ALJ accepted the moderate mental limitations described in Dr. Miller's report when developing the RFC and that the Court may not provide a post-hoc rationalization for the RFC when it wasn't explained by the ALJ, citing *Snell v. Apfel*, 177 F.3d 128, 134 (2d Cir. 1999).

These arguments are unpersuasive.  Consistent with the standards applicable to this Court's review, *see Mongeur*, 722 F.2d at 1040, the undersigned can discern from the record that ALJ Malvey found Dr. Miller's opinion to be unsupported and/or inconsistent in two ways.  First, he said that Dr. Miller's findings of social interaction, memory, and concentration issues

24

were inconsistent with the treatment records.  Second, he said that Dr. Miller's notation of auditory and visual hallucinations and paranoia were inconsistent with the treatment records, indicating Plaintiff denied such hallucinations.  He concluded nonetheless that Dr. Miller's diagnoses of major depressive disorder and PTSD were supported by the treatment history and Plaintiff's subjective statements about her symptoms.

This is not appellate counsel's a post hoc rationalization for agency action, as in *Snell*, where the Commissioner apparently tried to cure a defect in the Appeals Council's reasoning by arguing it had no need, in the first instance, to consider the doctor whom the Appeals Council had improperly considered. 177 F.3d at 133-34.  Rather, the Court finds that the ALJ explained his reasoning regarding Dr. Miller in plain terms, and his reasoning can be evaluated on this motion.

Likewise, Plaintiff cites *Burgess v. Astrue* on reply for the proposition that courts decline to affirm ALJ determinations on grounds that differ from findings in the ALJ's final decision. 537 F.3d 117, 131 (2d Cir. 2008) (noting the ALJ erred by relying on a doctor's opinion which failed to consider an MRI report in the record and declining to affirm where the Commissioner argued on appeal that the hitherto unconsidered MRI did not support the treating physician's opinion). Here, however, the Court is not affirming the ALJ determination on grounds that differ.  Rather, it is affirming the ALJ determination on substantially the same grounds:  an unremarkable treatment record supports the ALJ's findings because Dr. Fruitman's opinion was inconsistent with itself and the treatment records and Dr. Miller's opinion was somewhat supported and consistent.  And, as the Court will detail, the non-examining state agency consultant opinions were supported and consistent with the record.

25

Therefore, for completeness, the Court will also address the substantive adequacy of the explanation ALJ Malvey used to deem Dr. Miller somewhat persuasive.  First, is worth noting that Dr. Miller said Plaintiff was "moderately limited" regarding her abilities to "understand, remember, or apply complex directions or instructions, . . . sustain concentration and perform a task at a consistent pace, sustain an ordinary routine and regular attendance at work." (CAR, at 631.)  This finding was consistent with the findings of Dr. May and Dr. Kamin, who found the same degree of limitation—moderate—regarding Plaintiff's ability to "understand, remember, or apply information" and "concentrate, persist, or maintain pace." (*Id.* at 24 (noting "[t]he state agency mental consultants['] . . . opinions are persuasive"; *see also id.* at 98, 115.)  It is also consistent with Dr. Fruitman's assessment in the MIQ. (*Id.* at 935.)

Somewhat inconsistently, ALJ Malvey appears to have rejected Dr. Miller's finding of moderate limitations as not being consistent with other evidence in the record or supported by the record even though he accepted the state agency sources' identical findings of moderate limitations in several of these areas. (*See* CAR, at 24-25.)  In fact, the concentration and memory limitations were unanimously deemed moderate by Dr. May, Dr. Kamin, and Dr. Miller. The state agency mental consultants differed from the examining physicians only to the extent that they deemed Plaintiff's social limitations mild instead of moderate.

While inconsistencies in the ALJ's findings regarding the persuasiveness of the medical opinions and his other findings can sometimes be a basis to remand, it is not a basis for remand in this case. *Cf. Nunez v. Commissioner*, 164 F.4th 60, 71 (2d Cir. 2025) (reversing an ALJ determination that rejected almost all medical opinion evidence and concluded a claimant could work in a "goal-oriented setting," which was inconsistent with the ALJ's own

determination of a moderate limitation on concentrating and maintaining pace).  As in *Nunez*, the three doctors on whom the ALJ relied were unanimous that Plaintiff had moderate limitations with concentration and memory.  But unlike in *Nunez*, the ALJ here incorporated moderate limitations in these areas into his RFC.  Indeed, ALJ Malvey concluded that Plaintiff had moderate limitations regarding (1) memory; (2) social interaction; and (3) concentration. (*Id.* at 20-21, 102, 119, 631.)[9] *See also Nunez*, 164 F.4th at 69.  Thus, the ALJ's determination apparently adopted Dr. Miller's finding of a moderate limitation for social interaction while calling Dr. Miller's findings of moderate limitations unsupported and inconsistent with the treatment record.

However, this inconsistency and arguable error was harmless for two reasons.  First, his second reason for rejecting Dr. Miller's opinion in part—regarding Plaintiff's purported hallucinations—was well supported and consistent with the record.  Plaintiff does not address the second ground on which ALJ Malvey discredited Dr. Miller's report—namely that the hallucination evidence was unsupported by and inconsistent with the remainder of the medical record.  They point to no part of the medical record where Plaintiff complained of hallucinations, apart from her testimony at the hearing and Dr. Miller's notes.  Further, the treating physician—Dr. Fruitman—declined to indicate Plaintiff had signs or symptoms of hallucinations or delusions. (*Id.* at 934.)  Finally, the treatment records unambiguously show she consistently denied hallucinations.  This ground to reject Dr. Miller's opinion partially was therefore not an error and supports that the arguable error was harmless.

---

[9] Dr. Fruitman likewise endorsed that Plaintiff had difficulty thinking or concentrating and a moderate limitation in maintaining concentration, persistence, and pace. (*Id.* at 934, 935.)

Moreover, the treatment record supports ALJ Malvey's decision to adopt the moderate limitations in these three areas, which adoption only inured to Plaintiff's benefit at Step Four. One of the key supported and consistent findings in Dr. Miller's evaluation noted Plaintiff's attention and concentration "were deemed impaired due to emotional distress secondary to depression." (*Id.* at 23; *see id.* at 630.)  This finding shows that ALJ Malvey was appropriately persuaded by the reasons given by Dr. Miller for the moderate limitations to attention and memory.  Thus, he based his decision that Plaintiff had adequate RFC to perform some jobs on Dr. Miller's opinion that her attention issues were not primary features of her diagnosis but secondary, which was more than supported by the treatment record, as detailed in this opinion.  And it demonstrates ALJ Malvey adequately developed the record regarding his implicit finding[10] that Plaintiff would not miss more than one day per month and would not be off-task for more than 10% of the work day.[11]  ALJ Malvey correctly noted that the psychiatric treatment record was generally "unremarkable."  In light of the overwhelming evidence in the treatment record, this case is more similar to those in which an RFC for simple or unskilled work would reasonably account for moderate limitations as assessed by Dr. Miller. *See, e.g.*, *Platt v.*

---

[10] In her reply brief, Plaintiff argues that the Commissioner failed to meet its burden at Step Five that there are jobs in the national economy that Plaintiff could perform notwithstanding her limitations because there is no evidence that Plaintiff could sustain ordinary routine and attendance at work (*i.e.*, be absent less than 12 times per year and be off-task less than 10 percent of the work day) and her treating doctor, Dr. Fruitman, opined that she would be absent and off task far more.  However, this argument is not actually a criticism of the ALJ's opinion at Step Five but really an argument, addressed herein, that the ALJ erred in determining that she had moderate limitations in concentration and persistence but still impliedly concluding she would not miss work more than 12 times per year or be off-task more than 10 percent of the workday.  For the reasons given above, the Court finds that ALJ Malvey did not err in making his RFC determination, and the Court does not address any argument at Step Five.

[11] It is worth noting that Dr. Miller's conclusion that Plaintiff would have issues with attendance was supported only by reference to Dr. Fruitman's similar evaluation.  The ALJ did not err in concluding the treatment records did not support the attendance limitation.  The other three opinions found no significant limitation regarding Plaintiff's attendance. (*Id.* at 102, 119.)

*Comm'r of Soc. Sec.*, 588 F. Supp. 3d 412, 422 (S.D.N.Y. March 3, 2022); *McMillian v. Comm'r of Soc. Sec.*, No. 20 Civ. 7626 (KHP), 2022 WL 457400, at *6 (S.D.N.Y. Feb. 15, 2022).

As a result, while ALJ Malvey partially erred in his evaluation of Dr. Miller, the error was harmless.

    C.  *Whether the ALJ Improperly Relied on Non-Examining State Agency Opinions In Determining the RFC*

Plaintiff criticizes the ALJ's opinion for relying on non-examining state agency consultants who reviewed Plaintiff's file in 2022, rendering those opinions stale.  She further argues state agency opinions cannot, in any event, constitute substantial evidence, citing *Goggins v. Kijakazi*, No. 23-cv-285, 2024 WL 1259356, at *4 (E.D.N.Y. March 25, 2024), *Fintz v. Kijakazi*, No. 22-cv-00337, 2023 WL 2974132, at *6 (E.D.N.Y. April 15, 2023), and *Ortiz v. Colvin*, 3:15CV00956, 2016 WL 4005605, at *6 (D. Conn. July 26, 2016).

An ALJ is permitted to take into consideration the opinion of a non-examining source in determining a claimant's RFC; however, "because a treating source examines a claimant directly, they may have a better understanding of a claimant's impairments than if the medical source only reviews evidence in a claimant's folder." *Goggins*, 2024 WL 1259356, at *4 (cleaned up).  "While heavy reliance on a one-time examiner's opinion does not automatically constitute a legal error, the Second Circuit has warned that heavily relying on an examiner who only examined a claimant once is inadvisable." *Fintz*, 2023 WL 2974132, at *5.  Information about a Plaintiff's condition and limitations post-dating the opinion of a non-examining doctor may make that non-examining source's opinions more or less persuasive. 20 C.F.R. § 416.920c(c)(5).

In this case, the treatment records from late 2022 through March 2024 are consistent with the RFC and reflect improvement in Plaintiff's mental well-being with no episodes of

decompensation and therefore do not undermine the ALJ's reliance on the non-examining

sources' opinions.  Indeed, the ALJ noted that each evaluation from the non-examining sources

had citations to the record, the treatment records evidenced "occasional limits in interacting

but certainly no evidence of anything more," and Plaintiff "presented with adequate social skills

and appropriate eye contact at multiple evaluations." (CAR, at 24.)  In so finding, the ALJ also

cited to Dr. Miller's finding that Plaintiff had "adequate" social skills and a "cooperative"

demeanor. (*Id.* at 629.)  He also cited progress notes and treatment records from other treating

providers where Plaintiff presented cooperative without social interaction issues. (*Id.* at 641,

652, 685, 687, 692, 705-06, 854, 860, 863, 921, 939-41, 962.)  ALJ Malvey also noted the

treatment record shows generally unremarkable psychological evaluations, particularly after

the prescription of Ativan in 2021, recognizing her improving mental well-being.

Plaintiff cites *Ortiz v. Colvin*, No. 15 Civ. 956 (SALM), 2016 WL 4005605, at *6 (D. Conn.

July 26, 2016), but she overstates what that case stands for.  It is true that an ALJ "cannot rely

solely on the RFCs of the consulting examiners as evidence contradicting the Treating Physician

RFC." *Box v. Colvin*, 3 F. Supp. 3d 27, 42 (E.D.N.Y. 2014) (cleaned up).  To that extent, the *Ortiz*

court found that the ALJ's conclusion in that case "that both treating physician's opinions were

inconsistent" with treatment notes was erroneous, and thus the ALJ cherry-picked the evidence

by overemphasizing contradictory non-examining physician opinions. *Ortiz*, 2016 WL 4005605,

at *6.  Here, there is no evidence of cherry-picking.  The ALJ properly relied on Dr. Miller in part

and on the state agency mental consultants, whose findings were consistent with the

underlying treatment record (including, to some extent, Dr. Fruitman's MIQ).  There is no

erroneous finding of an inconsistency between the medical opinions of examining or treating

30

physicians and the treatment notes.  Given the unremarkable treatment record, if anything, the ALJ consistently drew inferences in favor of Plaintiff to determine that she had a more limited RFC than the treatment record might otherwise support.  Even with the benefit of those inferences, the ALJ appropriately concluded Plaintiff still had the RFC to do some simple jobs.

Thus, Plaintiff's argument that the evidence subsequent to the non-examining sources paint a different picture than what they concluded or what is in the RFC is unavailing.  There is simply no evidence in the record to support Plaintiff's assertion that her condition deteriorated after the non-examining sources issued their opinions; rather, the records show improvement in her condition.  This is not a case, therefore, where the ALJ substituted his lay judgment for that of the medical professionals who treated Plaintiff, as in *McBrayer v. Sec'y of H.H.S.*, 712 F.2d 795, 799 (2d Cir. 1983), or *Wagner v. Sec'y of H.H.S.*, 712 F.2d 795, 799 (2d Cir. 1991).  Rather, his determination was amply supported by substantial evidence in the record, most notably the clear and unremarkable medical treatment record which did not support and was inconsistent with Plaintiff's most significant claimed limitations.  Nor is it pertinent that clinical findings may change from one visit to another, *see Estrella v. Berryhill*, 925 F.3d 90, 97-98 (2d Cir. 2019), given that the treatment record showed *consistent* improvements in Plaintiff's condition over time.

Accordingly, there was no error in weighing the opinions of the non-examining state agency sources.

### D. *Whether the ALJ Improperly Discounted Plaintiff's Testimony About Her Limitations When Determining the RFC*

Plaintiff criticizes the ALJ's RFC finding, arguing it improperly discounted Plaintiff's subjective statements about her limitations without sufficient explanation for doing so and

contained no mention of the various factors to be considered when rejecting a plaintiff's

subjective statements as set forth in SSR 16-3p and 20 C.F.R. § 416.929.  She characterizes the

ALJ's explanation as "boilerplate language," and relying too heavily on Plaintiff's activities of

daily living, citing *Rucker v. Kijakazi*, 48 F.4th 86, 93 (2d Cir. 2022).

"An individual's statement as to pain or other symptoms shall not alone be conclusive

evidence of disability[.]" 42 U.S.C. § 423(d)(5)(A); *see also Mauro v. Comm'r of Soc. Sec. Admin.*,

746 F. App'x 83, 84 (2d Cir. 2019) (summary order) ("[S]ubjective complaints alone are not a

basis for an award of disability insurance benefits in the absence of corroborating medical

evidence.").  Here, ALJ Malvey said he "evaluated the consistency of [Plaintiff's] statements

with the findings in the objective medical evidence." (CAR, at 23.)  He concluded "[t]he overall

evidence establishes that the claimant will likely experience some of the symptoms and

functional limitations she reports, as outlined herein." (*Id.*)  But he concluded her "functional

limitations do not prevent her from meeting the basic demands of regular work on a sustained

basis." (*Id.*)  He noted "[t]reatment notes show that the claimant consistently denied having

symptoms of depression, a sad mood, mood lability, irritability, crying spells, or anxiety." (*Id.*)

He observed that on April 5, 2022, she endorsed that "psychotherapy treatment had been

beneficial" and on May 31, 2022, she "admitted that her psychotherapy treatment had been

beneficial." (*Id.*)  He reasoned "[t]here is not sufficient consistency to accept the allegations at

face value but there is enough consistency to justify the limitations in the residual functional

capacity" and that there were "jobs available" according to the Vocational Expert that Plaintiff

could perform.  This is an adequate explanation for his finding.

And this Court's review of the record confirms that ALJ Malvey's evaluation of Plaintiff's testimony and subjective complaints is supported by substantial evidence.  For example, while Plaintiff testified to multiple crying spells per week, the medical records do not support this and are not consistent with this testimony. (*Compare id.* at 45, *with id.* at 587, 602, 611, 684, 691, 696.)  Likewise, contrary to her testimony, the records show her sad mood, mood lability, anxiety, and irritability appeared to generally improve over time. (*See id.* at 587, 602, 611, 684, 691, 696.)  Further, ALJ Malvey correctly weighed and considered that Plaintiff cared for her grandchildren during the relevant period.  Plaintiff points to no part of the Administrative Record that supports an alternative determination.  Even if she did, however, there would be no basis for this Court to disturb the finding of ALJ Malvey, because a judge may only vacate and remand if "a reasonable factfinder would *have to conclude otherwise.*" *Brault v. Soc. Sec. Admin., Comm'r*, 683 F.3d 443, 448 (2d Cir. 2012); *see also Ponzini v. Comm'r of Soc. Sec.*, No. 20 Civ. 2522 (LJL), 2021 WL 4441512, *8 (S.D.N.Y. Sept. 28, 2021).

The Court does note that some of the treatment records contain more fulsome narratives about what Plaintiff's stressors were in a given week, but her narration of these stressors rarely exhibits that she experiences the sort of limitations, such as crying spells, that she complained of in her testimony and subjective statements in her evaluation with Dr. Miller. (*See id.* at 587, 602, 611, 684, 691, 696 (noting, *inter alia*, stress from getting dentures, family issues, issues with her grandchild's school and behavior, and anxiety regarding physical health).) This is true particularly considering on other days Plaintiff reported feeling "well," had "no complaints," and felt relief that her grandson was in school, which is consistent with and supports the conclusion that she had some moderate limitations in attention that were

secondary to emotional distress from depression. (*Id.* at 836, 842, 845, 851, 939, 948.)  Thus, having thoroughly reviewed the record, the Court finds no error in ALJ Malvey's findings as to Plaintiff's subjective statements about her limitations and symptoms.

Plaintiff spends much of her reply brief asserting that medical evidence may show certain functions in normal health while other elements are abnormal.  That may be so, but ALJ Malvey in this case appropriately considered relevant evidence regarding Plaintiff's asserted limitations.  This case is therefore unlike, for example, *Scognamiglio v. Saul*, 432 F. Supp. 3d 239, 252 (E.D.N.Y. 2020), where an ALJ erred by finding Plaintiff was not disabled because she was able to drive, go for short walks, prepare simple meals, go outside, shop in stores, and go to church.  In that case, the ALJ also ignored other evidence which made clear that the plaintiff's functionality was limited with respect to many or all of those ADLs; in other words, she performed those ADLs with very limited function. *Id.*  Here, ALJ Malvey's decision did not ignore key evidence of limitations in drawing his central conclusions; rather, he relied chiefly on medical evidence, narratives, opinions, and indicators which supported his conclusions.  He also considered and explained the evidence he rejected and why.  The similar cases that Plaintiff cites are therefore not persuasive. *Cf. Morgan v. Comm'r of Soc. Sec.*, No. 18 Civ. 2880, 2020 WL 3414696, at *6 (E.D.N.Y. June 22, 2020) (noting a plaintiff's report of ADLs by themselves are not substantial evidence of the absence of a disability and finding the ALJ inadequately explained how plaintiff's plain ADL limitations were inconsistent with medical opinions); *Iorio v. Comm'r of Soc. Sec.*, No. 18 Civ. 5898 (PKC), 2020 WL 1536406, at *7 (E.D.N.Y. Mar. 30, 2020) (noting limited functionality in plaintiff's performance of simple ADLs was consistent with the medical findings of her treating doctors' opinions and recommendations).  Here, ALJ Malvey's

34

findings regarding Plaintiff's subjective statement involved determining she had some limitations but the full range of her subjective complaints were not consistent with and supported by the overall medical record.  ALJ Malvey's findings are unquestionably supported by substantial evidence in the record.

In sum, the ALJ's opinion is supported by substantial evidence. Accordingly, the judgment of ALJ Malvey is affirmed.

## CONCLUSION

For the foregoing reasons, the Plaintiff's motion for judgment on the pleadings is DENIED, judgment is issued in favor of the Commissioner, and the action is hereby DISMISSED.

**The Clerk of Court is respectfully directed to terminate any pending motions and to close the case.**

**SO ORDERED.**

DATED:      New York, New York
            March 20, 2026

_____
KATHARINE H. PARKER
United States Magistrate Judge